[No. A066647. First Dist., Div. Five., May 19, 1995.]

CITY OF FREMONT, Plaintiff and Appellant, v.
SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT et al.,
Defendants and Respondents.

**[Opinion certified for partial publication.†]**

†Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II.B. through II.D.

COUNSEL

Heller, Ehrman, White & McAuliffe, Kenneth B. Finney and David S. Beckman for Plaintiff and Appellant.

Pillsbury, Madison & Sutro, Sharon M. Solomon, Craig E. Stewart and Steven W. Frank for Defendants and Respondents.

OPINION

PETERSON, P. J.—The City of Fremont filed a petition for a writ of mandate and administrative mandamus challenging a decision by the San Francisco Bay Area Rapid Transit District (BART) to certify a final environmental impact report (EIR) which was prepared in connection with BART's plan to extend one of its transit lines. Fremont opposed the project because part of the extension would run on elevated tracks through Central Park, the primary park for the citizens of Fremont. In its petition, Fremont alleged the EIR violated the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] because BART had not evaluated adequately the effects of the extension on Central Park. The trial court denied the petition, ruling the EIR was adequate under CEQA. Fremont now appeals. We will affirm.

I. FACTUAL AND PROCEDURAL BACKGROUND

The characteristics of BART are well known to residents of the Bay Area. It currently operates a 72-mile, 34-station, regional transit system that carries approximately 250,000 patrons daily. One of BART's transit lines currently ends in Fremont, near Central Park. The present dispute arises from BART's decision to extend the Fremont line south 5.4 miles to the Warm Springs area of Fremont.

Central Park covers approximately 440 acres in Fremont. Known as that community's one "city park," it was designed to serve all of Fremont, as

---

[1]Unless otherwise indicated, all subsequent statutory references are to the Public Resources Code.

well as the surrounding neighborhoods. The park offers a variety of facilities including an 83-acre lake (Lake Elizabeth), soccer fields, picnic areas, softball fields, a golf driving range, 4 children's playgrounds, and a 50-acre nature area. Fremont's Civic Center and administrative offices, an animal shelter, and a senior citizen center are also located within the park.

BART first proposed extending service to the Warm Springs area in 1956. Specific planning for the project, officially designated the Warm Springs Extension (hereafter WSX) began in 1979 when BART commissioned a study to identify possible route alignments. Because Central Park is located directly between the existing Fremont station and the proposed Irvington station, BART and Fremont first focused their efforts on alignments that would either swing away from the most heavily used portions of the park, or through the park in a subway. These evaluations and others (conducted by various local, state, and federal authorities) continued throughout the 1980's.

In 1988, the California Legislature passed a bill that required BART to begin constructing the WSX by December 31, 1991, if certain conditions were satisfied. (See Pub. Util. Code, § 29034.7.) Faced with this mandate, BART initiated the EIR process; and by 1990, it had produced a draft EIR that proposed a two-station project. BART circulated the EIR and received a number of comments which suggested it should expand the range of possible alternatives. Accordingly, BART voluntarily withdrew the document and began preparing a second EIR.

BART circulated the second EIR for comment in July 1991. The EIR is, by any measure, a massive document. The CEQA Guidelines[2] state that for "proposals of unusual scope or complexity" the text of an EIR should "normally be less than 300 pages." (Guidelines, § 15141.) The 1991 draft EIR, by contrast, covers over 800 pages. The final EIR (which includes BART's responses to comments and various revisions) covers more than 1,200 pages.

The project proposed in the EIR is a 7.8-mile extension of BART's Fremont line. The extension is to begin at the existing Fremont station, cut across the northern end of Central Park, and then run along an existing railroad corridor[3] to an area near the Santa Clara County line. The EIR also sets forth 11 alternatives to the project, reflecting different lengths, route alignments, and numbers of stations. Three of the alternatives are "no

---

[2] All references to "Guidelines" are to California Code of Regulations, title 14, section 15000 et seq., the state guidelines which implement CEQA.

[3] The rail corridor contains tracks owned by the Southern Pacific and Union Pacific railroad companies. The Southern Pacific tracks run through the eastern portion of Central Park. The

extension" options. All of the extension alternatives further incorporate a variety of design options.

The EIR also analyzes five alternatives for the portion of the extension that would pass through Central Park. The "Proposed Project" calls for an aerial structure that would cross over the northern finger of Lake Elizabeth and then align with the existing railroad tracks through the remainder of the park. The other four options are a subway along the same path as the proposed project, an aerial structure or subway along a path which is east of the proposed project and which avoids crossing Lake Elizabeth, and an aerial structure still farther to the east.

The impact of the project on Central Park is discussed throughout the EIR and in a separate section devoted exclusively to the park. This latter portion includes a detailed description of the park and its users, and provides an analysis of the impacts on the park caused by the project and various alternatives. The EIR also discusses Fremont's opposition to any aerial structure through the park and specifically notes this possibility is an "Area[] of controversy." The EIR states, however, that a subway would cost up to $60 million more than an aerial structure.

The EIR went through an extensive public comment period after it was issued. Fremont fully participated in this process, and it filed lengthy written comments which largely track the arguments it is advancing on this appeal. BART filed its written response to the comments it had received (including those from Fremont) in November 1991.

BART certified the EIR on September 15, 1992. It rejected the originally proposed 7.8-mile, 3-station extension and instead approved a 5.4-mile extension, with stations at Irvington and Warm Springs (alternative 5). As for Central Park, BART approved design option 2A which calls for an aerial structure that swings more to the east than the original proposal and thereby avoids Lake Elizabeth. BART also approved design option 2S which calls for a subway along that same route, and committed to building that alternative if Fremont could provide the funds necessary to offset the increased costs.

Fremont filed the present petition for writ of mandate and administrative mandamus shortly thereafter. It claimed that BART had violated CEQA because its EIR did not investigate adequately the effects of the extension

---

Union Pacific tracks run along the eastern border of the Park parallel to the Southern Pacific tracks. The area between the two sets of tracks is known as Central Park East.

(and in particular an aerial structure) on Central Park. The matter went to a hearing and the court denied the petition, ruling BART's EIR was adequate.[4] This appeal followed.

## II. DISCUSSION

Fremont advances the same basic argument it raised in the court below. It contends the EIR violated CEQA because BART did not investigate adequately the effect of the extension on Central Park. The general principles which govern our analysis are settled. ■ In reviewing an agency's actions under CEQA, this court must be guided by section 21168.5, which states our inquiry "shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (*Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161] (*Goleta Valley*).) It is not our function to pass on the correctness of the EIR's environmental conclusions, but only on its sufficiency as an informative document. (*Twain Harte Homeowners Assn.* v. *County of Tuolumne* (1982) 138 Cal.App.3d 664, 673 [188 Cal.Rptr. 233].) We look "not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (Guidelines, § 15151.) With this background, we address the specific arguments advanced.

A. *Whether the EIR Adequately Analyzed the Acquisition Phase of the Project*

The EIR recognized that an aerial structure through Central Park would cause significant adverse environmental consequences. As BART stated in its findings approving the project, "Construction of the aerial structure through Central Park will add a major new structure and regular transit train activity to the park environment, permanently changing its existing mix of structures, open space, and natural areas. . . . [T]he aerial structure would traverse a portion of the park that is intended to remain open and undeveloped. Considered together with its visual, acoustic, recreational and land use impacts (including inconsistency with the Fremont General Plan), . . . the Recommended Project with aerial Design Option 2A would result in an unavoidable significant residual adverse effect on Central Park." However,

---

[4] The court granted Fremont's petition in one respect. BART had approved the subway alternative on the condition that Fremont obtain the funds needed solely from local sources. The court ruled that BART lacked the authority to impose this condition and directed BART to vacate it. BART complied with this directive and filed notice with the court. BART has not appealed from this ruling.

BART still approved the aerial structure through the park while adopting the subway alternative as a backup: "BART . . . finds that Aerial Design Option 2A is the . . . preferred feasible alignment through Fremont Central Park because of [BART's] policy that rail extensions built in a subway configuration shall be paid for with local funds . . . . However, the cost of the subway alignment in Central Park is in excess of BART's current funding resources, and is, as a consequence, currently infeasible for economic reasons. Therefore, the subway alignment is contingent on [Fremont's] willingness and ability to identify and provide secured local funding for subway construction. After project adoption, if [Fremont] is able to provide secured local funding for the subway alignment through Central Park prior to commencement of Final Design, BART will implement the Alternative Recommended Project-Alternative 5 with the subway alignment (Design Option 2S.)"

Fremont now challenges the EIR's conclusion that a subway through Central Park would be more costly than an aerial structure and thus is "infeasible for economic reasons." It argues the EIR is inadequate because it does not provide any analysis to support the conclusion of infeasibility. We are unpersuaded. It is true that an EIR must disclose the "analytic route" used to reach a conclusion. (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 515 [113 Cal.Rptr. 836, 522 P.2d 12].) For example in *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 403-405 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*), our Supreme Court ruled an EIR was defective when it simply concluded, without any analysis, that certain alternative sites for a project were infeasible. However, that is not what happened here. BART was faced with a difficult drafting task because it had elected to evaluate so many different route alternatives and design options in the EIR. In order to keep the document manageable, BART logically chose to summarize the cost information in a series of tables which break the costs associated with each route alternative and design element into its individual components. By interpreting the tables, it is possible to estimate the costs associated with any particular project by evaluating its individual components. A review of those tables shows BART estimated the subway alternative through Central Park would cost an additional $60 million. We see nothing objectionable about this procedure. The analysis was adequate.

Next, Fremont contends the EIR's conclusion of infeasibility is not adequate because BART did not evaluate all relevant factors before reaching

this result. Fremont does not seriously challenge the EIR's estimate that a subway would cost as much as $60 million more than an aerial structure, nor does it dispute that the cost of acquiring the actual right-of-way through the park for both the aerial structure and subway alternatives would be roughly equivalent. Instead, it argues that the admittedly wide cost disparity could be eliminated by the severance damages BART might have to pay if it builds an aerial structure through the park.[5] According to Fremont, BART should have evaluated the possible effect of severance damages, and its EIR was defective because it failed to do so. We think this argument misapprehends the applicable standard of review. The issue is whether substantial evidence supports BART's conclusion that a subway was economically infeasible; and substantial evidence is defined as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. . . ." (Guidelines, § 15384.) The record here was more than sufficient to satisfy this standard. The tables discussed above, clearly reflect BART's estimate that a subway would cost up to $60 million more than an aerial structure, an amount in excess of BART's funding capabilities. Moreover, the compensation that BART must provide for taking park land is statutorily mandated by the California Public Park Preservation Act of 1971 (§ 5400 et seq.), section 5405 of which states that a public agency which acquires park land for public transit purposes must either pay compensation that is sufficient to acquire substantially equivalent substitute park land, or provide substitute park land of comparable characteristics.[6] BART fully

---

[5]Fremont argues throughout its brief that BART failed to consider its obligation to "acquire" additional park land to compensate for the "severance damages" which would be caused by an aerial structure through Central Park. By framing the issue this way, Fremont evidences a fundamental misunderstanding of condemnation law. A condemner must provide compensation for the property it takes *or* damages in the course of a public project. This principle is set forth in article I, section 19 of the California Constitution, which expressly states, "Private property may be taken *or damaged* for public use only when just compensation . . . has first been paid to . . . the owner." (Italics added.) However, a condemner is not required to "acquire" remaining property damaged by reason of severance of the part taken and construction of the improvements in the manner proposed. It must simply provide just compensation for any resulting diminution in value of the remainder property.

[6]Section 5405 is included in the Public Park Preservation Act of 1971 (§§ 5400-5409) and states in part: "[T]he amount of compensation or land, or both, required by this chapter for the *taking* of the park land . . . shall be equal to one of the following: [¶] (a) The cost of acquiring substitute park land of comparable characteristics and of substantially equal size located in an area which would allow for use of the substitute park land and facilities by generally the same persons who used the existing park land and facilities . . . . [¶] (b) Substitute park land of comparable characteristics and of substantially equal size located in an area which would allow for use of the substitute park land by generally the same persons who used the existing park land . . . ." (Italics added.) This statute and section 5401 simply require park land actually acquired or taken to be replaced.

discussed its obligations under this statutory scheme.[7] Fremont simply speculates that BART might have to pay severance damages to compensate for an alleged diminution in value to the remainder (uncondemned) portion of the park because of the noise and visual impact thereon of the aerial structure. While the EIR does conclude the proposed extension would have some adverse effects on the park, this does not, ipso facto, translate to infliction of significant severance damages on the remainder part. It is undisputed that the extension will run through an area of the park which is adjacent to two active railroad tracks and which is already subject to the impacts of a major road (Stevenson Boulevard) and "frequent small aircraft." It is also undisputed that, except for the very small area covered by the aerial support columns themselves, the entire park will still be available for use as a park. On this administrative record, we believe that BART impliedly and reasonably concluded that the extension would not result in any significant severance damages and, thus, properly declined to evaluate that possibility.[8]

■ Next, Fremont argues the EIR was defective because it failed to discuss BART's obligation to comply with the federal Land and Water Conservation Fund Act (16 U.S.C. § 460*l*-4 et seq.) (hereafter act or fund) when carrying out the project. Under that act, property acquired or developed with assistance from the fund cannot be converted to other than recreational uses unless "other recreational properties of at least equal fair market value and of reasonably equivalent usefulness and location" (16 U.S.C. § 460*l*-8(f)(3)) are substituted in its place. Fremont contends BART should have discussed its obligations under this statute because moneys from the fund were used to improve Central Park.[9]

It is true that BART failed to discuss whatever obligations it may have under this statutory scheme; however, the reason for this omission is clear.

---

[7]As BART stated when responding to a comment Fremont had submitted, "The Public Park Preservation Act of 1971 . . . provides that no agency of the state or public utility shall 'acquire . . . real property . . . in use as a public park, unless the acquiring entity pays or transfers to the legislative body of the entity operating the park sufficient compensation or land, or both, . . . to replace the parkland and facilities thereon[.'] [¶] BART understands the requirements of the Act and will provide for compensation under the terms of the Act. This will be done after the BART Board adopts a project for implementation."

[8]We state no opinion on whether BART will actually have to pay severance damages should it ultimately condemn land in Central Park. We simply conclude the EIR was adequate even though it did not specifically evaluate that possibility.

[9]During the EIR process, Fremont never provided BART with any information to support its claim that moneys from the fund were used to develop Central Park. However, Fremont did submit such evidence while the matter was being litigated in the superior court. Our Supreme Court recently ruled that, with certain exceptions, information that is not contained in the administrative record may not be used to challenge a decision under CEQA. (See *Western States Petroleum Assn.* v. *Superior Court* (1995) 9 Cal.4th 559, 573 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) We need not decide whether one of the exceptions is applicable here,

No one suggested that the fund might be implicated by this project until September 3, 1992, 10 months after the final EIR was circulated, and only 12 days before the certification hearing. Given that Fremont must have been aware it had received moneys from the fund, the fact that the issue was asserted at the last possible moment raises serious questions about the city's good faith. (Cf. *Goleta Valley, supra,* 52 Cal.3d at p. 568 ["We cannot, of course, overemphasize our disapproval of the tactic of withholding objections, which could have been raised earlier in the environmental review process, solely for the purpose of obstruction and delay."].) In any event, the legal issue is whether the omission renders the EIR inadequate; and when determining adequacy, "the test to be applied is not one demanding of absolute perfection but whether an objective, good faith effort to so comply is demonstrated." (*Mount Sutro Defense Committee* v. *Regents of University of California* (1978) 77 Cal.App.3d 20, 37 [143 Cal.Rptr. 365]; see also *Long Beach Sav. & Loan Assn.* v. *Long Beach Redevelopment Agency* (1986) 188 Cal.App.3d 249, 264 [232 Cal.Rptr. 772]; *Bowman* v. *City of Petaluma* (1986) 185 Cal.App.3d 1065, 1084 [230 Cal.Rptr. 413]; *Dusek* v. *Redevelopment Agency* (1985) 173 Cal.App.3d 1029, 1039 [219 Cal.Rptr. 346]; *Village Laguna of Laguna Beach, Inc.* v. *Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1029 [185 Cal.Rptr. 41]; Guidelines, § 15151.) The record here suggests BART did everything it could to identify and satisfy its obligations under CEQA, but that it was impeded by the issue which Fremont could (and should) have raised earlier. BART's good faith was apparent. Furthermore, we see a distinction between a failure to comply with CEQA which results in an omission of information, and a failure which has no effect on the information in an EIR. The fact that moneys from the fund were used to improve Central Park was relevant only because it triggered an obligation from BART to replace any park land it should acquire with similar park land elsewhere. BART already had that obligation under the California Public Park Preservation Act of 1971, and it fully discussed its obligations under this parallel statutory scheme. Under these circumstances, the omission was inconsequential. (Cf. *Al Larson Boat Shop, Inc.* v. *Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 748 [22 Cal.Rptr.2d 618] ["[T]he omission described could have no material effect on informed decisionmaking or informed public participation and was not prejudicial."].)

B.-D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

because whether moneys from the fund were in fact used to develop Central Park has no bearing on our ruling.

*See footnote, *ante,* page 1780.

## III. DISPOSITION

The judgment is affirmed.

King, J., and Haning, J., concurred.

A petition for a rehearing was denied June 13, 1995, and the opinion was modified to read as printed above.