[No. E012228. Fourth Dist., Div. Two. Oct. 4, 1995.]

ROLAND BARTHELEMY et al., Plaintiffs and Appellants, v. CHINO BASIN MUNICIPAL WATER DISTRICT, Defendant and Respondent.

SOUTHERN CALIFORNIA ASSOCIATION FOR RESPONSIBLE ENVIRONMENTAL DEVELOPMENT et al., Plaintiffs and Appellants, v. COUNTY OF SAN BERNARDINO, Defendant and Respondent; CHINO BASIN MUNICIPAL WATER DISTRICT, Real Party in Interest and Respondent.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III, IV, V, VII, VIII, and IX.

**COUNSEL**

Bright and Brown, John Quirk, Holley & Galen, Debra Burchard Coffeen and A. Steven Brown for Plaintiffs and Appellants.

Rourke, Woodruff & Spradlin, Thomas L. Woodruff, Thomas F. Nixon and Robert W. Lucas for Defendant and Respondent and for Real Party in Interest and Respondent.

No appearance for Defendant and Respondent County of San Bernardino.

## OPINION

## RICHLI, J.—

### I.

### INTRODUCTION

The Chino area is justly famous for its dairies. It is also famous, justly or not, for the pervasive odor of the manure generated by these dairies. From this case, we have learned that this manure is not merely an annoyance to olfactory sensibilities, but a serious threat to the quality of the water in the Chino Groundwater Basin.

Respondent Chino Basin Municipal Water District (the District) believes it has come up with a way to keep manure from polluting the local groundwater. It proposes mixing manure with sludge from its own wastewater treatment plants, "co-composting" them, and trucking the resulting compost to agricultural areas outside the Chino Basin. The District has acquired a site for these operations in the Chino Dairy Preserve. Also, pursuant to the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.),[1] it has prepared an environmental impact report (EIR) on the project.

Plaintiffs Roland Barthelemy (Barthelemy) and the Southern California Association for Responsible Environmental Development (SCARED) (collectively plaintiffs) objected to the project before, during, and after the preparation of the EIR. The trial court, however, upheld certification of the EIR and approval of the project.

In this appeal, plaintiffs contend that the trial court erred because:

1.  The EIR failed to discuss or analyze the possibility that the project might eventually use green waste in place of manure.

2.  The EIR failed to include information about:

    a.  The availability of two of the three alternative project sites it analyzed.

---

[1]All further statutory references are to the Public Resources Code, unless otherwise specified.

b. The effects the project would have at the preferred site, as compared to the alternative Chino Airport site, on airport operations.

c. The project alternative of trucking uncomposted manure out of the Chino Basin.

d. The "no project" alternative.

3. The District failed to provide good faith, reasoned responses to public comments about:

a. Impacts of a fire at the project.

b. Impacts on prime farmland.

c. Impacts on wildlife.

d. The adequacy of the stormwater detention basin.

e. The possibility that uncomposted manure would be stored at the site.[2]

The District is entitled to the benefit of a presumption that the EIR is adequate. Plaintiffs have failed to overcome this presumption. Thus, we affirm the trial court's judgment.

## II.

### Factual and Procedural Background

The Chino Dairy Preserve, home to Chino's dairy industry, overlies the Chino Groundwater Basin. A 1989 study by the Regional Water Quality Control Board found some 400,000 cows in the Chino Basin, churning out nearly 600,000 dry tons of manure a year.[3] About 53 percent of this manure remained in the Chino Basin; it was either applied to the land or stockpiled. As a result, nitrates and salts from the manure seep into the local groundwater, threatening its quality. Nitrates in the Chino Basin groundwater already exceed Environmental Protection Agency drinking water standards.

---

[2]At oral argument, SCARED also argued, for the first time, that the EIR improperly failed to treat the California Institution for Women as the equivalent of a "residential area." Because SCARED never made this contention in its opening brief, or even in its reply brief, we deem it waived. (*Opdyk* v. *California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830 [41 Cal.Rptr.2d 263]; *Dameshghi* v. *Texaco Refining & Marketing, Inc.* (1992) 3 Cal.App.4th 1262, 1291, fn. 18 [6 Cal.Rptr.2d 515].)

[3]The relationship between wet tons and dry tons of manure may vary. However, as a rule of thumb, solids make up 65 percent of wet manure, so that one wet ton equals 0.65 dry tons.

The District supplies water to an area of about 242 square miles, including Chino, Fontana, Montclair, Ontario, Rancho Cucamonga, and Upland. Its operations generate a different, but similarly unpleasant, by-product: sludge. Its two wastewater treatment plants produce about one hundred fifty tons of sludge per day. Historically, private contractors have hauled the sludge away; it is applied to the land, composted, or simply dumped into landfills.

Around 1990, the District hit on the idea of cocomposting its sludge with manure. Under the District's plan, as subsequently developed and refined (the Project), 500 to 1,100 wet tons of manure and 50 to 150 wet tons of sludge per day would be hauled to the Project site. Front-end loaders would mix these ingredients and shape them into "windrows" six feet high. The mixture would be lovingly watered, stirred, and monitored as it slowly decomposed. In eight to ten weeks, it would be transmuted into fertilizer, which would be trucked to agricultural areas in the San Joaquin, Imperial, or Coachella Valley.

To prevent soil and groundwater contamination, the Project site would be covered with cement 10 inches thick. Rainwater would be captured in a detention basin and used in the composting process. The working portions of the site would be surrounded by four-foot high berms and landscaped with shrubs and pepper trees, which would conceal the unappetizing interior from public view.

On February 1, 1990, the District commenced an eminent domain proceeding to acquire the site for the Project. The site is in the southern portion of the Chino Dairy Preserve. It consists of one 17.36-acre parcel and a second contiguous 80-acre parcel. Once farmed, it is now lying fallow. It is surrounded by dairies, cropland, and a few homes. The site is directly across the road from a prison, the California Institution for Women (CIW). Chino Airport is also nearby. On February 14, 1990, the District took prejudgment possession of the 80-acre portion of the site. (See Code Civ. Proc., §§ 1255.410-1255.480.)

In April 1990, the District adopted a mitigated negative declaration for the Project. Plaintiffs went to court, asserting that the negative declaration was inappropriate and that the District should have prepared an EIR. Ultimately, the trial court agreed, and ordered the District to prepare an EIR for the Project.[4]

---

[4]Plaintiffs are understandably eager to bring the details of the District's earlier CEQA violation to our attention. In doing so, however, they ignore recognized evidentiary limitations.

On July 18, 1990, the District entered into a contract with a joint venture of San Joaquin Composting and EKO Systems, Inc. (project operator) to operate the Project. Pursuant to this contract, the District would own and improve the Project site. It would pay the project operator disposal fees for manure and sludge delivered to the site; the project operator would carry out the composting and would sell the resulting compost for its own account.

On February 19, 1991, a stipulated judgment was entered in the eminent domain proceeding by which the District acquired the 80-acre portion of the site. The District has advised us that, at least as of the judgment below, it had not yet acquired the remaining 17.36-acre portion of the site.

On February 22, 1991, the District completed a new initial study which concluded that the Project could have a significant effect on the environment, and hence that an EIR was required. Also on February 22, 1991, the District issued a notice of preparation of a draft EIR. On March 6, 1991, the District held a "scoping" meeting to allow public comment on the scope and content of the draft EIR. Plaintiffs spoke at the public hearing and submitted written comments on the Project.

On May 9, 1991, the District made the draft EIR available for public review and comment. On May 29, 1991, the District held a public meeting to allow comment on the draft EIR. Once again, plaintiffs spoke at the meeting and submitted written comments on the draft EIR. The District prepared responses to the comments it had received. The District circulated these responses for further public comment, then prepared further responses to the further comments. All of the comments and responses were incorporated into the final EIR.

On January 22, 1992, the District certified the final EIR, adopted a mitigation monitoring program, adopted a statement of overriding considerations for the Project, and approved the Project.

On February 19, 1992, plaintiffs filed a petition for writ of mandate directed at the District. This proceeding was assigned case No. RCV-061640. On June 8, 1992, the District filed an answer to the petition.

Because the County of San Bernardino (County) had issued a conditional use permit for the Project, plaintiffs also filed a petition for writ of mandate

---

As support for this portion of their statement of facts, plaintiffs cite allegations of their own petitions. The District, however, denied the pertinent allegations. The petitions were never offered into evidence. If they had been, they would not have been admissible. They were filed without verifications; one of plaintiffs' attorneys verified them belatedly, but only on information and belief, leaving them hearsay. Thus, we cannot accept the allegations of the petitions as true.

directed at the County, with the District named as real party in interest. This proceeding was assigned case No. RCV-062506.

On June 23, 1992, the parties stipulated to consolidate case Nos. RCV-061640 and RCV-062506. They also stipulated that the issuance or denial of a writ of mandate in case No. RCV-061640 would be determinative of the issuance or denial of a writ of mandate in case No. RCV-062506.

On July 10, 1992, plaintiffs filed a motion for writ of mandate, set for hearing on September 10, 1992. On August 7, 1992, the District filed its opposition to the motion. After a brief hearing on September 10, 1992, the trial court took the matter under submission. On October 22, 1992, the trial court issued a minute order denying the petitions. On December 7, 1992, it issued a written order stating findings and reasons for denying the petitions. Also on December 7, 1992, it entered judgment denying the petitions.

On January 12, 1993, plaintiffs filed a timely notice of appeal from the judgment.

III.-V.*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

VI.

### THE STANDARD OF REVIEW FOR CLAIMS THAT THE EIR OMITTED RELEVANT INFORMATION

Many of plaintiffs' claims revolve around whether the District's EIR concealed, ignored, excluded, or—less pejoratively—simply failed to provide certain information. The parties vehemently disagree concerning the standard of review applicable to such claims. The District characterizes them as claims that the EIR's determinations are not supported by substantial evidence. They conclude that "the traditional, deferential substantial evidence test applies."

Plaintiffs, on the other hand, argue that "improperly excluding relevant information" is a failure to proceed in the manner provided by law, which cannot be excused on the theory that "the decision of the agency is nevertheless supported by the material which it has chosen to selectively include in its own record." They conclude that a de novo standard of review applies.

---

*See footnote, *ante*, page 1609.

■ " ' "Under CEQA, an EIR is presumed adequate [citation], and the plaintiff in a CEQA action has the burden of proving otherwise." ' " (*Concerned Citizens of South Central L.A.* v. *Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 836 [29 Cal.Rptr.2d 492], quoting *Al Larson Boat Shop, Inc.* v. *Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 740 [22 Cal.Rptr.2d 618], quoting *State of California* v. *Superior Court* (1990) 222 Cal.App.3d 1416, 1419 [272 Cal.Rptr. 472].)

"In reviewing the sufficiency of an EIR, the rule of reason applies." (*A Local & Regional Monitor* v. *City of Los Angeles* (1993) 12 Cal.App.4th 1773, 1793 [16 Cal.Rptr.2d 358].) " 'The court does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document.' " (*Laurel Heights Improvment Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 392 [253 Cal.Rptr. 426, 764 P.2d 278], quoting *County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 189 [139 Cal.Rptr. 396].) "CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive. . . . The absence of information in an EIR, or the failure to reflect disagreement among the experts, does not per se constitute a prejudicial abuse of discretion. [Citation.] A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process. [Citation.]" (*Kings County Farm Bureau* v. *City of Hanford* (1990) 221 Cal.App.3d 692, 712 [270 Cal.Rptr. 650]; see also § 21005.)

In *Kings County Farm Bureau* v. *City of Hanford*, *supra*, 221 Cal.App.3d 692, the question as to the standard of review was expressly presented. While the EIR was in preparation, several commentators had argued that its cumulative effects analysis should consider similar projects throughout the entire San Joaquin Valley air basin. Nevertheless, the final EIR limited its cumulative effects analysis to the mid-San Joaquin Valley. (*Id.*, at p. 721.)

On appeal, project opponents argued that ". . . the question whether the scope of the cumulative impacts analysis was unduly narrow presents an issue of law." (221 Cal.App.3d at p. 722.) The project proponent, on the other hand, argued that ". . . the determination of the scope of the analysis is, in essence, a question of fact to be determined by the lead agency and the court must conclude the EIR was adequate unless the analysis omitted important information. In making this determination, . . . a court cannot look outside the record and must find the EIR to be adequate if there is any substantial evidence to support the scope chosen by the agency." (*Ibid.*)

The court then held that: "The primary determination is whether it was reasonable and practical to include the projects and whether, without their inclusion, the severity and significance of the cumulative impacts were reflected adequately." (221 Cal.App.3d at p. 723.) It noted that the EIR had considered only 30 projects in the mid-San Joaquin Valley area, although the administrative record showed that some 116 projects were planned in the entire San Joaquin Valley. (*Id.*, at p. 724.)

It found that the EIR could reasonably and practically have included projects in the entire basin. (221 Cal.App.3d at p. 724.) It further found that: "Because the record does not provide information regarding similar energy developments in the San Joaquin Valley air basin, the agency could not, nor can we, determine whether such information would have revealed a more severe impact. Accordingly, the EIR is inadequate. To conclude otherwise would place the burden of producing relevant environmental data on the public rather than the agency and would allow the agency to avoid an attack on the adequacy of the information contained in the report simply by excluding such information." (*Ibid.*) Thus, although the court never explic-itly chose between the standards of review proposed by the parties, it essentially applied the substantial evidence test; it found the EIR legally inadequate because the record did not contain sufficient evidence to support the lead agency's determination to limit its cumulative effects analysis.

More recently, in *City of Fremont* v. *San Francisco Bay Area Rapid Transit Dist.* (1995) 34 Cal.App.4th 1780 [41 Cal.Rptr.2d 157], the court similarly applied a substantial evidence standard of review to a claim that an EIR failed to disclose information. There, the project proponent (BART) proposed constructing an aerial rapid transit route extension. (*Id.*, at pp. 1783-1785.) Among project alternatives, the EIR also considered constructing the extension underground; however, it concluded that this alternative would cost $60 million more than the project, and therefore was economically infeasible. (*Id.*, at pp. 1785, 1787.)

On appeal, the project opponent claimed the aerial extension could require the payment of severance damages, which would lessen the cost disparity between the project and the underground alternative. It argued that "BART should have evaluated the possible effect of severance damages, and its EIR was defective because it failed to do so." (34 Cal.App.4th at p. 1788.)

The court, however, responded: "[T]his argument misapprehends the applicable standard of review. The issue is whether substantial evidence supports BART's conclusion that a subway was economically infeasible . . . .

The record here was more than sufficient to satisfy this standard." (34 Cal.App.4th at p. 1788.) The cost of a subway exceeded BART's funding capabilities. (*Ibid.*) Also, there was evidence which, while not conclusive, permitted an inference that severance damages would not be due. (*Id.* at p. 1789.) The court concluded: "On this administrative record, we believe that BART impliedly and reasonably concluded that the extension would not result in any significant severance damages and, thus, properly declined to evaluate that possibility." (*Ibid.*)

We also find guidance in *Laurel Heights Improvment Assn.* v. *Regents of University of California, supra,* 47 Cal.3d 376. There, the project opponent (the Association) argued that the EIR provided insufficient mitigation. (*Id.,* at p. 407.) The lead agency (the Regents) had relied in part on environmental sampling studies. (*Id.,* at p. 408.) The Court of Appeal held these studies inadequate and unreliable in that, among other things, they involved ground-level samples only and not air samples, and they failed to explain that radiation levels found were in excess of the control level. The Regents responded that ground-level samples were more reliable and informative than air samples, and that the radiation levels did not exceed the control levels by a statistically significant amount. (*Id.,* at pp. 408-409.)

The Supreme Court stated: "The Court of Appeal in effect performed its own scientific critique of the studies and found the Regents should not have relied on them. This approach is inconsistent with the principle that 'The court does *not* have the duty of passing on the validity of the conclusions expressed in the EIR, but only on the sufficiency of the report as an informative document.' [Citation.] It is also well established that '[d]isagreement among experts does not make an EIR inadequate.' [Citation.]

"[T]he issue is not whether the studies are irrefutable or whether they could have been better. The relevant issue is only whether the studies are sufficiently credible to be considered *as part of* the total evidence that supports the Regents' finding of mitigation. We find the studies are sufficient for that purpose." (47 Cal.3d at p. 409.) In a footnote, it added, "We do not suggest that a court must uncritically rely on every study or analysis presented by a project proponent in support of its position. A clearly inadequate or unsupported study is entitled to no judicial deference. The Association, however, has failed to demonstrate that the two studies are clearly inadequate or unsupported." (*Id.,* at p. 409, fn. 12.)

After considering various other attacks on the mitigation provisions of the EIR (see 47 Cal.3d at pp. 410-421), the court "conclude[d] that, when

considered individually, some of the evidence proffered by the Regents is subject to reasonable criticism. The EIR might be a more useful document if it included some of the information the Association seeks. That some items or types of evidence, however, are less than conclusive does not mean the evidence as a whole is not substantial." (*Id.*, at pp. 421-422.) It held that "*taken as a whole*, there was substantial evidence to support the Regents' conclusion that the environmental effects of the project, as now defined, will be mitigated." (*Id.*, at p. 422, fn. omitted; see also *No Slo Transit, Inc.* v. *City of Long Beach* (1987) 197 Cal.App.3d 241, 255 [242 Cal.Rptr. 760] [ridership estimates in EIR could not be attacked as inconsistent with estimates by another agency].)

We find in these cases a prophylactic safeguard for the substantial evidence test. Determinations in an EIR must be upheld if they are supported by substantial evidence; the mere presence of conflicting evidence in the administrative record does not invalidate them. A project opponent cannot obtain a more favorable standard of review by arguing that the EIR failed to disclose the conflicting evidence, and therefore the lead agency has not proceeded in a manner required by law; the project opponent must *also* show that the failure to disclose the conflicting evidence precluded informed decisionmaking or informed public participation.

However, *even in determining the prejudicial effect of the failure to disclose*, a court must resolve any factual issues in favor of the lead agency, if supported by substantial evidence. "Challenges to an EIR's adequacy usually involve questions such as the proper scope of the analysis, the appropriate methodology for studying an impact, the reliability or accuracy of data, the validity of technical opinions, and the feasibility of further studies. These determinations are ultimately based on factual issues. . . . The question for a reviewing court should then be limited to whether the agency's reasons for proceeding as it did are supported by substantial evidence." (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act. (Cont.Ed.Bar 1995) § 12.5, at pp. 464-465.) The failure to include information in an EIR normally will rise to the level of a failure to proceed in the manner required by law only if the analysis in the EIR is clearly inadequate or unsupported. (See 1 Kostka & Zischke, *supra*, § 12.5, at p. 464 ["An independent review of the sufficiency of an EIR is usually triggered when the record contains no substantial evidence to support the method of analysis that is claimed to be defective."].)

If the conflicting evidence is not in the administrative record, the project opponent faces two additional hurdles. First, if no one introduced the

supposedly conflicting evidence in the administrative proceedings, normally the doctrine of exhaustion of administrative remedies will bar a project opponent from arguing that the EIR improperly omitted such evidence. (See § 21177; see generally, 2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, § 23.94, pp. 1001-1004.)

Second, as we discussed in an unpublished portion of this opinion, evidence outside the administrative record generally is inadmissible to show that the agency has not proceeded in the manner required by law. (*Western States Petroleum Assn.* v. *Superior Court* (1995) 9 Cal.4th 559, 565, 574-576 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) However, extra-record evidence is admissible if the proponent shows that the evidence existed before the agency made its decision, but that it was impossible in the exercise of reasonable diligence to present it to the agency before the decision was made. (*Id.*, at p. 578.) Also, arguably, extra-record evidence may be admissible to show "agency misconduct." (*Id.*, at pp. 575-576, fn. 5.) Thus, if a project opponent argues that the agency failed to proceed in the manner required by law because the EIR failed to disclose information that is not in the administrative record, it must first overcome the general rule that such information is inadmissible by showing that one of these exceptions applies.

## VII.-X.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

## X.

### DISPOSITION

The judgment is affirmed. The District shall recover costs on appeal against plaintiffs.

Hollenhorst, Acting P. J., and McDaniel, J.,† concurred.

A petition for a rehearing was denied November 1, 1995, and the opinion was modified to read as printed above. The petition of all appellants for review by the Supreme Court was denied December 21, 1995. Mosk, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante*, page 1609.

†Retired Associate Justice of the Court of Appeal, Fourth District, sitting under assignment by the Chairperson of the Judicial Council.