[No. D022183. Fourth Dist., Div. One. Feb. 16, 1996.]

NATIONAL PARKS AND CONSERVATION ASSOCIATION et al.,
Plaintiffs and Appellants, v.
COUNTY OF RIVERSIDE et al., Defendants and Respondents;
KAISER STEEL RESOURCES, INC., et al., Real Parties in Interest and
Respondents.

1508

**COUNSEL**

Gibson, Dunn & Crutcher, Joel S. Moskowitz, Gary L. Justice and Sheila R. Caudle for Plaintiffs and Appellants.

William C. Katzenstein, County Counsel, Joe S. Rank, Assistant County Counsel, Jay G. Vickers, Deputy County Counsel, Greines, Martin, Stein & Richland and Timothy C. Coates for Defendants and Respondents.

Bruen & Gordon, Scott W. Gordon, Best, Best & Krieger, D. Martin Nethery and Sharyl Walker for Real Parties in Interest and Respondents.

**OPINION**

**HUFFMAN, J.**—In 1992, the board of supervisors for the respondent County of Riverside (the County) approved a landfill project proposed by real parties in interest Kaiser Steel Resources, Inc., Kaiser Eagle Mountain, Inc., and Mine Reclamation Corporation (MRC) (sometimes collectively Kaiser/MRC), and also approved the environmental impact report (EIR) prepared to analyze that project, pursuant to the California Environmental

Quality Act (CEQA). (Pub. Resources Code,[1] § 21000 et seq.) Appellants herein, National Parks and Conservation Association et al. (the Association) brought a petition for writ of mandate challenging the certification of the EIR and the various approvals issued by the County related to the landfill project, including the approval of the development agreement. (Code. Civ. Proc., §§ 1085, 1094.5.) The matter was transferred to the Superior Court of San Diego County and, after briefing and hearing, the trial court agreed with a number of the Association's challenges to the EIR, but found two particular challenges unmeritorious.

The Association appeals the judgment granting the writ of mandate, contending that the trial court erroneously ruled against it that certain prospective facilities which would process trash to be dumped in the landfill, materials recovery facilities (MRF's), need not be discussed in detail in the EIR for the landfill. The Association also contends the trial court erroneously ruled that it was not required that Kaiser's related entity, MRC, have a current legal or equitable interest in the dumpsite property in order to enter into a development agreement with the County, within the meaning of Government Code section 65865.[2] We conclude the trial court correctly interpreted applicable statutory and case law and the Association's challenges to the judgment are without merit. We affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

The trial court succinctly described the undisputed facts concerning the project in its statement of decision, which we quote in pertinent part:

"The Eagle Mountain open pit iron ore mine was the location of extensive mining operations by Kaiser Steel Corporation from 1948 to 1983. The mine is located approximately 200 miles east of Los Angeles, 50 miles west of the Arizona border, 10 miles north of Desert Center, and approximately one and one half miles south of Joshua Tree National Monument. The mining operation resulted in the excavation of three large open pits; each[] one to two miles long. The mining operation ceased in 1983, and Kaiser has leased the mine site to the prospective operator of the landfill.

"[MRC] plans to utilize the open pits left from the mining operation to create what all parties have agreed is the largest landfill in the country. The

---

[1] All statutory references are to the Public Resources Code unless otherwise specified.

[2] Kaiser/MRC also appealed the judgment granting the petition for writ of mandate, but has since abandoned that appeal; the County did not appeal. Only the cross-appeal by the Association is before this court. The County has joined in the respondent's brief filed by Kaiser/MRC.

landfill footprint will encompass approximately 2,262 acres within a larger project area of 4,654 acres. The landfill will have the capacity to accept up to 20,000 tons per day of wastes for a minimum of 115 years.

"The landfill will receive most of the waste from Los Angeles and other Southern California counties. Ninety percent of the garbage will be shipped by rail and the balance by truck. All waste will be delivered after processing at materials recovery facilities (MRF's) which accept delivery of trash from homes and businesses and compact the waste into containers for transportation.

"· · · · · · · · · · · · · · · · · · · · · · · ·

"The landfill accepts only nonhazardous solid waste and inert wastes that have been processed through MRFs. The Draft EIR states a typical MRF would require about 10 to 30 acres and an enclosed structure of about 100,000 square feet. [ ] The garbage is delivered to the MRF by truck and dumped on the floor of the structure. Workers sort through the waste and remove unacceptable materials such as hazardous waste, sewage sludge, radioactive, biological or infectious waste, and other materials needing special handling. Recyclable materials may be recovered. The remaining wastes are compacted and packaged into containers that hold up to 25 tons each and then loaded onto rail cars, each of which holds 10 containers. The containers are then transported to the landfill. [ ] Approximately 10 percent of the wastes will be transported by truck rather than rail.

"The Draft EIR notes that since the exact locations of the MRFs are unknown, specific land use conditions and impacts of these facilities are not discussed, although considerations would include noise, dust, odors, traffic and other impacts. [ ] There is no further discussion of the MRFs either as part of the project description itself or as an environmental consequence of the landfill project."

The statement of decision goes on to describe a townsite to be developed to serve the landfill, based on a previous company town built in the area, and further describes the process of preparing and obtaining approval of the EIR.

The County's approval of the project included a requirement that jurisdictions sending waste to the landfill comply with the source reduction and recycling requirements of the Integrated Waste Management Act of 1989 (§ 40000 et seq.). In its joint trial brief, the County and Kaiser/MRC described solid waste processing facilities, of which MRF's are an example, in this manner: " 'Solid waste processing facilities,' also called materials

recovery facilities (MRFs), provide separation and recovery of recyclable materials from wastes destined for landfilling. (Pub. Res. Code §§ 40200, 40194, 40172, 40180.) These facilities are typically enclosed structures, utilizing waste handling vehicles and mechanical equipment to separate and sort recyclable materials from the solid waste. [ ] Source reduction and recycling are key elements of the state's legislatively-mandated program for reducing the amount of waste going to landfills. (See, e.g., Pub. Res. Code §§ 40002, 41003[, subds.] (c) & (e), 41073, 41260[, subd.] (b).)"

In its trial brief, the Association described the information given in the EIR about MRF's: "What we are given is about a page containing the elements of a typical to large processing and transfer station. [ ] We know that a 'site of about 10 to 30 acres would be necessary and an enclosed structure of about 100,000 square feet would be needed to house the operation.' [ ] A shipping container used at each such facility can carry about 25 tons of compacted trash. A typical facility would generate about 140 containers per day or enough to load 14 train cars. [ ] The basic idea is that waste is brought in trucks to the transfer stations, where it is separated, compacted and screened for hazardous waste. The non-hazardous waste is then consolidated so that it can be hauled in larger volumes to the Eagle Mountain dump."

The Association's trial brief then complains that although the environmental effects of MRF's are obvious (e.g., odor, traffic, air pollution, and noise), such effects are not mentioned in the EIR's summary of a typical MRF nor with respect to the collective effect of MRF's. The Association quotes from the EIR: " 'Several off-site solid waste processing and transfer stations (materials recovery facilities, or MRFs) will be necessary to serve the landfill.' [ ] 'Operation of the project would depend on the transfer of waste from a system of MRFs or processing and transfer stations located throughout the area served by the landfill. Some of these exist and others would be developed in the future.' []" The EIR deals with the MRF's as follows:

"Each of these stations requires its own local land use permit (a conditional use permit in most cases) and its own solid waste facilities permit. These actions associated with the off-site transfer stations are not covered by this draft EIS/EIR.

"·  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"Several off-site solid waste processing and transfer stations will be necessary to serve the landfill; however, they are not part of the proposed

action and are not discussed in detail in this draft EIS/EIR." The reason given in the EIR for not discussing the MRF's was that they did not yet exist.

Based on this approach in the EIR, the Association contended at trial that the project was inadequately described because the MRF's were not considered part of the project by the authors of the EIR, and/or the EIR was inadequate because it failed to discuss the effects of the MRF's on the surroundings in sufficient detail. The Association also argued that Kaiser's related entity, MRC, could not properly enter into the development agreement with the County because it had not yet obtained a legal and equitable interest in all of the property that would make up the landfill. Specifically, some portions of the landfill site were currently owned by the federal Bureau of Land Management (BLM) which has agreed to exchange that land with Kaiser for other land, with approval of the land exchange pending while certain appeals by project opponents are processed. The development agreement between the landfill proponents and the County Board of Supervisors defines MRC as the owner of the property, although it is currently only a lessee of some of the subject land from its related entities, Kaiser, and will obtain a further interest in the other land when BLM and Kaiser complete their land exchange.

This case was heard together with two related cases, and after full briefing and trial, the trial court issued its statement of decision.[3] The trial court first ruled in favor of the Association on a number of its contentions: (1) the EIR should have included as part of the project and should have discussed the expansion of the townsite near the landfill; (2) cumulative impacts should have been discussed regarding the landfill and the townsite; (3) the EIR was inadequate in describing a proposed hydroelectric project at this location as remote and speculative; and (4) the evidence was insufficient to support the conclusions drawn by the EIR in certain critical areas regarding desert tortoise habitat, seismic activity, the proximity of Joshua Tree National Monument, as well as the failure to consider a toxic waste survey.

However, the trial court's statement of decision rejected the Association's argument that the MRF's were required to be included in the project description, even though the exact location and size of any particular MRF was unknown at that time. The trial court stated: "Just as oil wells cannot

---

[3]The related cases included a petition for writ of mandate challenging the landfill project brought by parties in propria persona, Laurence and Donna Charpied, and an action by Eagle Mountain Energy Company against the County, also challenging the sufficiency of this EIR. Those related actions are not involved in this appeal.

function without pipelines, so this landfill cannot operate without MRFs. However, if an oil well is not drilled, there will be no pipeline. In this situation, there will be trash and facilities to dispose of that trash whether the Eagle Mountain landfill operates or not. It is entirely appropriate to consider those trash facilities wherever they be at the time they are planned. At that time, a full environmental assessment can be completed. The discussion of the MRFs in this EIR is adequate."

The trial court then ruled that the development agreement was valid, contrary to the Association's argument that MRC had an insufficient legal or equitable interest in the property where the landfill would be sited. (Gov. Code, § 65865.) The trial court found:

"The agreement is conditional in that it specifically provides that it shall not become effective until the developer acquires a fee interest in the BLM property which would be part of the proposed landfill. [ ] The developer already had a significant legal interest in the bulk of the adjacent land which would be developed. At the time of entering into the development agreement, it was reasonably foreseeable the developer would acquire an interest in the BLM land.

"In order to effect the legislative intent, the Court concludes under the particular circumstances of this case, the law should be liberally construed to allow this agreement to stand. To hold otherwise would unduly restrict public agencies from working with private entities to develop housing and other facilities needed to support the growing population."

The Association timely appealed the judgment. As previously noted, Kaiser/MRC also appealed the judgment but has dismissed that appeal. We have judicially noticed certain materials submitted by Kaiser/MRC showing that the County has vacated and set aside all entitlements issued which had allowed the project to proceed, including the certification of the EIR and the ordinance authorizing the development agreement. The notice of preparation of the new EIR, designed to respond to the judgment as issued in this case, has also been judicially noticed. (Evid. Code, §§ 452, subd. (c), 459.)[4]

---

[4]In its respondent's brief, Kaiser/MRC has raised the question of whether this appeal has become moot due to the effect of the judgment and writ of mandate which required the certification of the EIR and the project entitlements to be vacated, and which resulted in resubmission of applications for new authorizations for the project and the preparation of a new EIR. However, the MRF and development agreement issues are not only likely to recur, but are actually still in controversy between the same parties. Thus, it is appropriate for this court to retain this case for decision. (*In re William M.* (1970) 3 Cal.3d 16, 23 [89 Cal.Rptr.

## Discussion

■ As noted by the trial court, all parties agreed the proper inquiry by the trial court was whether there was a prejudicial abuse of discretion by the County in approving the EIR and in issuing related entitlements to proceed with the project. "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5.) It is a judicial function to consider an EIR's adequacy. (*City of Santee* v. *County of San Diego* (1989) 214 Cal.App.3d 1438, 1447 [263 Cal.Rptr. 340] (*City of Santee*).) "Courts, however, do not pass upon the correctness of an EIR's environmental conclusions, but only upon its sufficiency as an informative document. [Citation.]" (*Ibid.*) " 'In applying the substantial evidence standard, "the reviewing court must resolve reasonable doubts in favor of the administrative finding and decision." ' [Citation.] The appellate court's role 'is precisely the same as the trial court's,' and lower court's [*sic*] findings are not 'conclusive on appeal.' [Citation.]" (*San Joaquin Raptor/Wildlife Rescue Center* v. *County of Stanislaus* (1994) 27 Cal.App.4th 713, 722 [32 Cal.Rptr.2d 704] (*San Joaquin Raptor*).) With these standards in mind, we discuss the Association's arguments regarding the adequacy of the MRF discussion in the EIR. We then turn to the separate issue of the validity of this development agreement in light of the type of interest Kaiser/MRC holds in the subject property.

I

*MRF's: Solid Waste Transfer/Processing Stations*

A

*Applicable Standards*

■ Where, as here, there is dispute over the proper scope of a project, certain rules regarding the adequacy of the project description and future environmental consequences of a project come into play. The term "project" is broadly interpreted to maximize protection of the environment. (*San Joaquin Raptor*, *supra*, 27 Cal.App.4th at p. 730.) " 'An accurate project description is necessary for an intelligent evaluation of the potential environmental effects of a proposed activity.' [Citation.]" (*Ibid.*)

Significant cumulative effects of a project must be considered in an EIR. (*Laurel Heights Improvement Assn.* v. *Regents of University of California*

33, 473 P.2d 737]; *In re Marriage of Abernethy* (1992) 5 Cal.App.4th 1193, 1197 [7 Cal.Rptr.2d 342].)

(1988) 47 Cal.3d 376, 394 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*); § 21083, subd. (b).) Under the administrative guidelines for EIR's, an adequate discussion of cumulative impacts may include a list of "past, present, and reasonably anticipated future projects producing related or cumulative impact . . . ." (Cal. Code Regs., tit. 14, § 15130, subd. (b)(1)(A) (the Guidelines).) In *Laurel Heights, supra,* 47 Cal.3d 376, the Supreme Court considered "what circumstances require consideration in an EIR of future action related to the proposed project." (*Id.* at p. 395.) The Supreme Court stated the following test: "[A]n EIR must include an analysis of the environmental effects of future expansion or other action if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects." (*Id.* at p. 396.) The Supreme Court explained that "[u]nder this standard, *the facts of each case* will determine whether and to what extent an EIR must analyze future expansion or other action." (*Ibid.,* italics added.) Thus, discussion in at least general terms of future activity in connection with a project is required in an EIR. (*Id.* at p. 398.) However, ". . . where a proposed project itself is fully evaluated in an EIR, it is not improper to omit discussions of other separate projects. [Citation.]" (*Del Mar Terrace Conservancy, Inc.* v. *City Council* (1992) 10 Cal.App.4th 712, 735 [12 Cal.Rptr.2d 785] (*DMTC*), disapproved on other grounds in *Western States Petroleum Assn.* v. *Superior Court* (1995) 9 Cal.4th 559, 576, fn. 6 [38 Cal.Rptr.2d 139, 888 P.2d 1268].)

██ In *No Oil, Inc.* v. *City of Los Angeles* (1987) 196 Cal.App.3d 223, 236-237 [242 Cal.Rptr. 37] (*No Oil, Inc.*), the court used as part of its analysis a test developed in *County of Suffolk* v. *Secretary of Interior* (2d Cir. 1977) 562 F.2d 1368, 1378, for deciding the extent to which treatment of a subject in an environmental impact statement or report for a multistage project may be deferred. The two factors are: " '(1) whether obtaining more detailed useful information on the topic of transportation is "meaningfully possible" at the time when the EIS for an earlier stage is prepared, [citation], and (2) how important it is to have the additional information at an earlier stage in determining whether or not to proceed with the project [citation].' " (*No Oil, Inc., supra,* at pp. 236-237.) An EIR is not required to include speculation as to future environmental consequences of future development that is unspecified and uncertain. (*DMTC, supra,* 10 Cal.App.4th at p. 730.) Overall, the EIR must "adequately apprise all interested parties of the true scope of the project for intelligent weighing of the environmental consequences of the project." (*City of Santee, supra,* 214 Cal.App.3d at pp. 1454-1455.)

B

*Deferral of Environmental Analysis: Case Law*

The Association first relies on *No Oil, Inc., supra*, 196 Cal.App.3d 223, where the court examined the adequacy of an EIR prepared for an oil drilling project. There, the parties conceded that since any oil extracted for production would be transported by pipeline, the EIR had to contain some discussion of the pipeline's effects. (*Id.* at p. 233.) "The draft EIR discussed the pipeline in terms of construction noise, risk of upset, mitigation measures, and impact on traffic and aesthetics." (*Id.* at p. 234.) However, opponents of the projects contended that the EIR failed to fully analyze the location, extent, and environmental impacts of the proposed pipeline routes. The Court of Appeal stated these pipelines were a single facet of a large project and, although the EIR had to discuss their environmental effects, ". . . there was no need to discuss every potential route the pipeline may take." (*Id.* at p. 235.) The court explained that because of the unknowns regarding the quantity and quality of oil extracted during the exploration phase of the project, it would be mere speculation to engage in any in-depth discussion of the proposed pipeline. Instead, an EIR would be prepared at the time that a specific route for the pipeline was authorized by city authorities, and it was therefore proper for the current EIR to defer in-depth consideration of the environmental effects of the proposed pipeline routes. (*Id.* at p. 237.)

The Association also relies on *Santiago County Water Dist.* v. *County of Orange* (1981) 118 Cal.App.3d 818 [173 Cal.Rptr. 602] (*Santiago*), where the court found an EIR prepared for a proposed sand and gravel mine was insufficient because it did not give information about the delivery of water to the proposed mine. The EIR failed to describe the facilities that would have to be constructed to deliver water to the mine, "or facts from which to evaluate the pros and cons of supplying the amount of water that the mine will need." (*Id.* at p. 829.)

Next, the Association cites *San Joaquin Raptor, supra*, 27 Cal.App.4th 713, where an EIR prepared for a residential development project was found inadequate because it omitted any reference to sewer expansion, which was recognized in the draft EIR as necessary to the project. (*Id.* at pp. 729-730.) Relying on *Santiago, supra*, 118 Cal.App.3d at page 830, the court found that the additional water delivery facilities in *Santiago* were directly analogous to the construction of additional sewer capacity in the *San Joaquin Raptor* project. "Both are crucial elements without which the proposed projects cannot go forward." (*San Joaquin Raptor, supra*, at p. 732.)

In *Rio Vista Farm Bureau Center* v. *County of Solano* (1992) 5 Cal.App.4th 351 [7 Cal.Rptr.2d 307] (*Rio Vista Farm*), an EIR for a hazardous waste management plan was found sufficient over challenges that the EIR failed to describe potential future facilities or to describe the degree to which project-level decisions had been made by the county. The court held, "The flaw in appellant's argument is that the Plan makes no commitment to future facilities other than furnishing siting criteria and designating generally acceptable locations" (*id.* at p. 371) for future waste management facilities. The court explained, "The Plan is not a project development proposal which contemplates additional development or even the acquisition of property for future facilities without further consideration of environmental consequences or upon issuance of a negative declaration. [Citations.]" (*Id.* at p. 372.)

In *Christward Ministry* v. *County of San Diego* (1993) 13 Cal.App.4th 31 [16 Cal.Rptr.2d 435], this court upheld the trial court's determination that an EIR prepared for a proposed expansion of a landfill was adequate regarding the project description, cumulative impacts, and other analyses. The court found the project description of the proposed landfill expansion was adequate even though the EIR also considered the impact of the project in relation to other solid waste projects which were independent of the landfill in question. (*Id.* at p. 44.) This court found further analysis of future environmental effects of the project was not required because the record did not show this project was part of a contemplated larger project which required further study. Instead, the project description was adequate because it permitted the public, interested parties, and public agencies to balance the proposed project's benefits against the environmental costs, to consider appropriate mitigating measures, and to assess whether terminating the proposal or other alternatives were appropriate. (*Id.* at p. 46.) We noted that an EIR's project description is not rendered inadequate simply because the EIR also discusses and analyzes other proposed and existing related projects which are independent of the subject project. (*Id.* at p. 44.)

## C

### Analysis

In its statement of decision, the trial court described the landfill facility as receiving waste *after processing* at MRF's, which will accept delivery of trash from homes and businesses and then compact the waste into containers for transportation to the landfill site. The landfill will accept only nonhazardous solid waste and inert wastes *that have been processed* through MRF's. The court noted that the EIR states that since the exact location of the MRF's

are unknown, "specific land use conditions and impacts of these facilities are not discussed, although considerations would include noise, dust, odors, traffic and other impacts." Although the trial court noted the landfill cannot operate without MRF's, it found that whether this landfill project was operable or not, there would still be trash in existence and facilities to dispose of that trash. It would thus be appropriate, the court stated, to consider such trash facilities, wherever they may be, at the time they are planned; at that time, a full environmental assessment could be completed.

With the authority discussed above in mind, we examine the record concerning the MRF's to determine the sufficiency of the EIR in this respect. ■■■ The Association complains that the information in the EIR only covers the method of operation of the MRF's, not their environmental effects. It argues that discussion of environmental effects of support facilities is required in the EIR, as with the sewer expansion in *San Joaquin Raptor* and the water supply facilities in *Santiago*. They point out that although extensive discussion of the pipeline was not required in *No Oil, Inc.*, a general discussion of environmental impacts of pipelines in general was supplied. They also contend that even if the MRF's should be viewed as a severable project, the cumulative effects of the two projects should have been addressed more fully in the EIR. (The Guidelines, § 15378, subds. (a) & (c); § 21083, subd. (b).)

■■■ Under the reasoning of *No Oil, Inc., supra*, 196 Cal.App.3d at pages 236-237, discussion of a support facility (such as an oil pipeline) is not required in an EIR for the project the facility is to serve if: (1) obtaining more detailed useful information is not meaningfully possible at the time when the EIR for the project is prepared, and (2) it is not necessary to have such additional information at an earlier stage in determining whether or not to proceed with the project. (*Ibid.*) The MRF's are in some respects a support facility for the landfill, although, as the trial court noted, similar facilities will have to be located somewhere, whether or not this project is completed, unlike the oil pipeline which would not be constructed absent approval of the drilling facility in *No Oil, Inc., supra*, 196 Cal.App.3d 223.

■■■ Applying this test, first, it is difficult to see how much more detailed, useful information about these MRF's can be supplied at the present when it is not known where they will be situated and who will be operating them. As stated in the County's resolution adopting the EIR: "Applicable land use approvals are within the responsibility and jurisdiction of other public agencies (agencies where recovery facilities ultimately will be located). Since their exact locations to serve the project are unknown at

this time, specific existing land use conditions and specific impacts associated with the potential siting of transfer stations cannot be and are not addressed. *Therefore, any potential impacts cannot be evaluated at this time.* The siting of each facility will be the subject of land use, zoning, and environmental review and approvals by the affected local agencies. *Undertaking any such analysis at present would involve speculation and conjecture.* Therefore, the potential for incompatibility of the stations with existing uses at future locations to be determined will be fully addressed by the appropriate agencies at the time of project approvals for each such facility." (Italics added.)

Unlike in *Santiago* and *San Joaquin Raptor*, the MRF's are not "crucial elements without which the proposed projects cannot go forward" (*San Joaquin Raptor*, *supra*, 27 Cal.App.4th at p. 732), because on the facts of this case, the design of the landfill treats them as separate projects, not elements of this project. Also, one of the County's conditions for approval of the landfill project was that the waste going to the landfill must first be processed at an MRF or a solid waste processing and transfer station to assure compliance with the Integrated Waste Management Act of 1989. (§ 40000 et seq., also known as Assem. Bill No. 939 (the Act).) The Act requires recycling and source reduction to reduce the amount of solid waste going to landfills. (§ 41780.) Under the Act, the County was required to prepare an integrated waste management plan discussing source reduction operations such as MRF's or solid waste transfer and processing stations. (§ 41750 et seq.; the Guidelines, §§ 18730-18748, 18752-18754.5.) The landfill project is designed to accept processed waste, such as through MRF's. The Act does not specifically use the term MRF's, although at section 40200 it defines a solid waste transfer or processing station.[5]

Thus, not only the definition of the project, but also the statutory scheme under the Act, support the conclusion that the processing stage is a separate project from the landfill itself, and environmental review of such processing facilities may be properly deferred.[6] Although discussion in general terms is required of possible future expansion of a project or other such action, where

---

[5]Section 40200, subdivision (a) defines transfer or processing station as "those facilities utilized to receive solid wastes, temporarily store, separate, convert, or otherwise process the materials in the solid wastes, or to transfer the solid wastes directly from smaller to larger vehicles for transport, and those facilities utilized for transformation."

[6]The Association argues that the record does not support Kaiser/MRC's argument that MRF's will be built anyway regardless of whether the landfill is built as planned. The record shows that a condition of the County's approval of the project was that the waste to be placed in the landfill must first be processed at an MRF or a solid waste processing and transfer station, under the terms of the Act. These statutory references, combined with the County's findings in its resolution adopting the EIR that applicable land use approvals for the MRF's to be built are within the jurisdiction of other public agencies, where the recovery facilities

a proposed project itself has been fully evaluated in an EIR, discussion of separate projects may be omitted. (*DMTC*, *supra*, 10 Cal.App.4th at p. 735.) Deferral of environmental assessment does not violate CEQA where an EIR cannot currently provide meaningful information about speculative future projects. (*Rio Vista Farm*, *supra*, 5 Cal.App.4th at p. 373.) Moreover, the landfill project makes no commitment to build MRF's as future facilities; these processing facilities will be built separately. (*Id.* at p. 372.) No further discussion of cumulative effects is required. (§ 21083, subd. (b).)

Secondly, under the *No Oil, Inc.*, *supra*, 196 Cal.App.3d 223 test, it is not necessary to have such additional information at an earlier stage in determining intelligently whether to proceed with this project. There are adequate environmental safeguards in the approach taken here, because a jurisdiction desiring to send waste to the landfill project will have to conduct environmental review before processing that waste, either through MRF's or through other forms of solid waste transfer and processing stations. (§ 40200.) Moreover, the landfill effects of noise, traffic, odors, and air pollution are already known environmental risks. Under *Laurel Heights*, *supra*, 47 Cal.3d at page 396, an EIR must include an analysis of the environmental effects of future expansion "or other action" if that action "will likely change the scope or nature of the initial project or its environmental effects." (*Ibid.*) Even though MRF's or other solid waste transfer and processing stations (§ 40200) are proposed to be used to process the trash before it is deposited, they will not change the overall "scope or nature of the initial project or its environmental effects." (*Laurel Heights*, *supra*, 47 Cal.3d at p. 396.)

Since information is available about the method of operation of the MRF's both in the EIR and in the statutory scheme of the Act, this EIR for the landfill adequately apprises the interested parties of the true scope of the project to allow intelligent weighing of its environmental consequences. (*City of Santee*, *supra*, 14 Cal.App.3d at pp. 1454-1455.) Accordingly, the Association's request that the judgment be modified to require the revised EIR to analyze the effects of the MRF's is without merit.

## II

### *Validity of Development Agreement*

■ The Association contends the judgment should have included an order setting aside the development agreement as inconsistent with Government Code section 65865, subdivision (a), providing that a public entity may

---

ultimately will be located, provide adequate record support for the trial court's conclusion that the trash and trash facilities will exist whether subject landfill operates or not, so that environmental assessment of those facilities could properly be deferred.

enter into a development agreement "with any person having a legal or equitable interest in real property for the development of the property . . . ." Due to the pending land exchange between BLM and Kaiser/MRC, the Association contends MRC's interest in the landfill property is insufficient to comply with this section.

The development agreement provides that it is "entered into effective on the effective Date, as defined herein . . . ." The agreement defines the effective date as the date of recordation, "provided, however, that in no event shall this Agreement become effective . . . until and unless [MRC and its parent companies] have acquired the fee interest in the property which is currently owned by the United States of America and administered by the [BLM]." The record shows the County has a policy not to execute development agreements until the developer has the requisite interest in the land. The condition of MRC acquiring the fee interest in the property was required by the County to comply with the terms of Government Code section 65865, subdivision (a).

In interpreting this agreement, the trial court made findings that the developer already had a significant legal interest in the bulk of the adjacent land to be developed, and it was reasonably foreseeable the developer would also acquire an interest in the BLM land. The court thus ruled: "In order to effect the legislative intent, the Court concludes under the particular circumstances of this case, the law should be liberally construed to allow this agreement to stand. To hold otherwise would unduly restrict public agencies from working with private entities to develop housing and other facilities needed to support the growing population."

In the article authorizing such development agreements, Government Code section 65864, subdivision (b) states as a purpose of the statutory scheme that the public planning process will be strengthened and private participation in comprehensive planning and cost reduction will be encouraged where the applicant for a development project may receive assurances through such an agreement that, upon approval of the project, the applicant may proceed in accordance with existing policies, rules and regulations. This section is evidently intended to encourage multiphase developments by reducing the risk of subsequent regulatory changes. Along these lines, Kaiser/MRC sought County approval of its development agreement to allow it to pursue the lengthy process of securing necessary regulatory approvals.

In a similar factual context, Government Code section 65865, subdivision (b) permits conditional development agreements dealing with real property

that is subject to annexation, which agreements shall not become operative unless annexation proceedings are completed within the period of time specified by the agreement. There, as in the land exchange context, approval of the agreement gives the developer the assurances needed to proceed with the project. In this respect at least, the Legislature permitted a broad interpretation of the terms of Government Code section 65865, subdivision (a).

Contrary to the Association's argument, the issue of the effective date of the agreement is not wholly unrelated to the question of whether there was any binding agreement at all "entered into" between the parties. The agreement is, by its terms, "entered into" effective on the defined effective date. Evidently, the parties intended to assure that MRC had sufficient interest in the property in order to make the agreement effective under the statute. The parties were within their rights to agree that their agreement should not become effective until the happening of the specified event. (*Paratore* v. *Scharetg* (1942) 53 Cal.App.2d 710, 713 [128 P.2d 560]; *Du Frene* v. *Kaiser Steel Corp.* (1964) 231 Cal.App.2d 452, 457-458 [41 Cal.Rptr. 834].)

In general, substantial compliance is the governing test for determining whether statutory requirements have been met. (*Downtown Palo Alto Com. for Fair Assessment* v. *City Council* (1986) 180 Cal.App.3d 384, 394 [225 Cal.Rptr. 559].) Strict compliance is required only when the intent of the statute can only be served by such a test. (*Ibid.*) "Substantial compliance . . . means actual compliance in respect to the substance essential to every reasonable objective of the statute." (*Stasher* v. *Harger-Haldeman* (1962) 58 Cal.2d 23, 29 [22 Cal.Rptr. 657, 372 P.2d 649], italics omitted.) The "reasonable objectives" of the development agreement article are to promote an orderly planning process and encourage private participation in such planning, particularly for large projects subject to many types of regulation. (Gov. Code, § 65864, subd. (b).)

We agree with the trial court that these objectives can best be served by a liberal construction of the statute to allow this agreement to be found binding on the parties, consistent with their agreement that a specified effective date controls. Although the agreement is binding on the parties according to its terms, the agreement does not bind the use of the land unless and until the land transfer is accomplished. The development agreement interrelates these two concepts in a manner compatible with the purpose of the statute. Accordingly, MRC has a sufficiently defined and adequate interest in the property to permit it to enter into the development agreement with the County upon the specified terms.

## DISPOSITION

The judgment is affirmed.

Work, Acting P. J., and Haller, J., concurred.