Filed 6/8/20

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| NORTH MURRIETA COMMUNITY, LLC, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CITY OF MURRIETA et al., <br><br> Defendants and Respondents. | E072663 <br><br> (Super.Ct.No. RIC1800423) <br><br> OPINION |

APPEAL from the Superior Court of Riverside County. Randall S. Stamen, Judge. Affirmed.

Cox, Castle & Nicholson and Kenneth B. Bley for Plaintiff and Appellant.

Best Best & Krieger, Jeffrey V. Dunn, and Daniel L. Richards for Respondent, Western Riverside Council of Governments.

No appearance for Respondent, the City of Murrieta

Appellant, North Murrieta Community, LLC (North Murrieta), is the master developer of a large development project in the City of Murrieta (the City) called the Golden City Project.

As part of the planning and approval process, North Murrieta sought to take advantage of certain statutory land use planning tools—vesting tentative maps and development agreements—that enable builders to lock in place regulations, conditions, and fees municipalities may enforce against them while a project proceeds. These tools encourage development by, among other things, helping to make costs predictable despite the fact this kind of project can take years or even decades to complete.

In July 1999, North Murrieta obtained approval for a vesting tentative map on part of the Golden City Project property. The map locked in place fees the City could charge the developer until the vesting tentative map expired two years later. In March 2001, four months before the map would expire, North Murrieta and the City entered a development agreement covering the entire Golden City Project property. The agreement extended the term of the vesting tentative map for 15 years and also locked in place regulations and fees the City could enforce against the developer on the entire project for the same period.

Critically, however, the development agreement explicitly allowed the City to impose new fees on North Murrieta to mitigate the effects of development, provided the new fees were generally applicable and designed to address effects not fully mitigated by fees or exactions in place when the parties entered the development agreement. The City

subsequently passed the Western Riverside County Transportation Uniform Mitigation Fee Program Ordinance (the TUMF ordinance), which was designed for just that purpose. (Murrieta Ord. No. 277-03.)

In 2017, the City charged the new mitigation fees to a subsequent purchaser and developer of a subset of the affected properties. The builder made $541,497 in TUMF payments from July to October 2017, and the City transferred the bulk of those funds to respondent, Western Riverside Council of Governments (WRCOG). Both the developer and North Murrieta protested the fees. The purchaser assigned their rights to North Murrieta, who brought a petition for writ of mandate.

North Murrieta asked the trial court to order return of the TUMF payments and requested declarations that the City couldn't impose the new mitigation fees under the extended vesting tentative map until it expired in 2019 and can't impose those fees under the development agreement until it expires in 2021. The trial court held the development agreement established the parties' rights and permitted the City to impose the new fees under the TUMF ordinance. North Murrieta appealed.

We agree with the trial court. Though the vesting tentative map limited the fees the City could collect to those in place when the City approved the map, North Murrieta agreed to modify those rights—both extending their duration and allowing the City to impose new generally applicable mitigation fees—by entering the development agreement with the City. The development agreement is a contract, which the trial court correctly enforced. We therefore affirm the judgment.

3

# I

# FACTS

A. *The Vesting Tentative Map and the Development Agreement*

The parties largely agree on the relevant facts. In 1999, North Murrieta applied for approval of vesting tentative map 28532 (the vesting tentative map), which covers part of the Golden City Project area. Approval of a vesting tentative map generally precludes a city from imposing certain conditions not in effect at the time it approves the map. "When a local agency approves or conditionally approves a vesting tentative map, that approval shall confer a vested right to proceed with development in substantial compliance with . . . the ordinances, policies, and standards in effect at the time the vesting tentative map is approved or conditionally approved." (Gov. Code, § 66498.1; see also Gov. Code, § 66474.2; unlabeled statutory citations refer to this code.) The City approved North Murrieta's application for vesting tentative map 28532 on July 28, 1999.

Developers may also obtain a measure of certainty about the costs associated with multi-year projects by entering development agreements with municipalities. "Unless otherwise provided by the development agreement, rules, regulations, and official policies governing permitted uses of the land, governing density, and governing design, improvement, and construction standards and specifications, applicable to development of the property subject to a development agreement, shall be those rules, regulations, and official policies in force at the time of execution of the agreement." (§ 65866.)

4

On March 6, 2001, the City and North Murrieta entered a development agreement for the Golden City Project Specific Plan, which set out the terms and conditions for development of the entire Golden City Project, including the property subject to vesting tentative map 28532. The Murrieta City Council (City Council) passed Ordinance No. 230-01 adopting the development agreement on the same day.

In passing the ordinance, the City Council found the development agreement "is in the best interest of the City because it provides for the construction of infrastructure needed to serve development in the area; allows the City to collect fees for operational costs for police and fire services which cannot otherwise be collected under existing City ordinances; allows the City to impose future mitigation fees on the project if said fees are applied throughout the City; provides funds for fire and police services and facilities earlier than required under the previous Public Facilities Financing Plan for the project; and is consistent with the General Plan Land Use Designation of 'Specific Plan', the Golden City Specific Plan and Section 16.54 of the Murrieta Municipal Code."

Among many other things, the agreement extended the term of the vesting tentative map at issue in this case. Generally, such maps expire within 24 months of approval. (§ 66452.6, subd. (a).) However, municipalities may extend them by entering development agreements. (*Ibid.*) Here, the City and the developer entered a development agreement extending the vesting tentative map—and certain of the developer's rights under the map—for 15 years, until March 5, 2016—the agreement's termination date.

The City later (on December 9, 2015) extended the term of the development agreement to March 5, 2021.

The same section of the development agreement makes clear it froze most of the terms, conditions, and fees the City could impose on the developer. "In extending the duration of tentative tract maps, City shall not impose any additional conditions or fees, or changes in design, density or other policies, rules or regulations which differ from the original approval of the Project except as otherwise provided for herein."

However, the agreement does purport to make two changes to the developer's rights. First, under the heading "Permit Conditions and Exactions (Fees and Charges)," the agreement changes the date on which the developer's rights vested. "The development impact fees, user fees, linkage fees, assessments, charges, general or special taxes, municipal financing, land dedication requirements, fees and charges . . . which may be imposed by the City . . . are limited to those Exactions . . . currently adopted by the City as of the Effective Date," which we've noted was March 5, 2001. That's approximately two years later than the freeze date North Murrieta had previously obtained for the portion of the property covered by the vesting tentative map.

Second, the same section also reserved to the City the power to impose *additional* fees or to *increase* fees, so long as they are "effective Citywide (not specifically enacted to apply or be discriminately adverse to SPM-5) for project impacts which are not fully mitigated by existing fees or exactions at the time of the City's approval of this Development Agreement." Though the parties haven't submitted a copy of the vesting

6

tentative map, they appear to agree it didn't allow the City discretion to impose new mitigation fees like the development agreement envisions.

B. *The Transportation Uniform Mitigation Fee Ordinance*

About two years later, on February 4, 2003, the City Council adopted the TUMF ordinance. The ordinance originated as a program designed by WRCOG for adoption by the authorities in its member jurisdictions, which includes the City. WRCOG's purpose was to have all member cities adopt the program ordinance and raise funds to improve the regional transportation system to meet the needs of regional development.

In adopting the TUMF ordinance, the City Council found new fees were needed to avoid traffic congestion and ensure the availability of safety services for the public. The council found "[a]bsent a Transportation Uniform Mitigation Fee (TUMF), existing and known future funding sources will be inadequate to provide the necessary improvements to the Regional System, resulting in an unacceptably high level of traffic congestion within and around Western Riverside County." They also found "the failure to mitigate growing traffic impacts on the Regional System within Western Riverside County will substantially impair the ability of public safety services (police and fire) to respond. The failure to mitigate impacts on the Regional System will adversely affect the public health, safety and welfare."

The ordinance provides for new mitigation fees to mitigate the effects of development projects on transportation. "The purpose of this section is to mitigate growing traffic impacts on the Regional System within Western Riverside County by

7

collecting fees from residential and non-residential developments. The fees will be used to construct the transportation improvements that are necessary for the safety, health and welfare of the residential and non-residential users of the development projects on which the TUMF will be levied."

The TUMF ordinance applies generally to "all new development projects within the City," but contained a list of exceptions. Relevant here, the ordinance initially exempted "[p]rojects with vesting tentative tract or parcel maps." However, in 2010 the City Council removed the exemption for projects with vesting tentative maps. This act made the TUMF ordinance apply by its terms to the Golden City Project.

C. *Imposition of TUMF*

On February 5, 2015, North Murrieta completed its application for a grading permit on a portion of the property that would be designated as tract 28532-4, which is a portion of the property within the Golden City Project covered by vesting tentative map 28532.[1]

About a year later, on February 26, 2016, the City Council approved the final map creating tract 28532-4 and the City recorded the final map, less than a month before the vesting tentative map and the development agreement were set to expire. On May 17, 2016, the City issued a grading permit for the lots within tract 28532-4. Typically, the

---

[1] Though the City admits North Murrieta completed its application for a grading permit, WRCOG denied this in its answer, saying it lacked sufficient information to admit the allegation. They claim no record evidence supports the allegation and contest its truth on appeal. We conclude the fact isn't relevant to deciding the case but include it here for background.

8

rights conferred by a vesting tentative map expire one year after the recording of a final map. (Gov. Code, § 66498.5, subd. (b); Murrieta Mun. Code, § 16.96.050.C.3.) However, the City approved an application to extend the vesting rights to March 26, 2019. As we previously noted, the City had already extended the term of the development agreement to March 5, 2021.

D.R. Horton is the developer of the lots within final tract 28532-4. After the City demanded payment of additional mitigation fees, they made TUMF payments to the City totaling $541,497 from July to October 2017. The City transferred the mitigation fees to WRCOG, retaining only a $4 administrative fee on each transaction. Thus, WRCOG received TUMF payments of $541,253 from D.R. Horton, and the City retained $244 as administrative fees.

D.R. Horton and North Murrieta objected to having these fees imposed. Both companies sent letters explaining their objections on October 5 and November 6, 2017. According to both companies, neither the City nor WRCOG refunded the fees. On December 5, 2017, D.R. Horton assigned to North Murrieta its claim for a refund of the TUMF payments. Both companies submitted to the trial court declarations and copies of the assignment to support North Murrieta's ability to challenge the collection of the fees.

D.  *Petition for Writ of Mandate*

On January 5, 2018, North Murrieta filed a petition for writ of mandate seeking to recover the TUMF payments from the City and WRCOG. The petition stated three causes

9

of action. In the first two, they sought refunds of the TUMF payments from the City and WRCOG, respectively.

In the third cause of action, they asked for a declaratory judgment that TUMF payments couldn't be required in connection with lots in final tract map 28532-4 until after March 26, 2019 because the City had extended the vested rights until that date. They also asked for a declaration that TUMF payments cannot be required in connection with any of the lots within the Golden Project Specific Plan (which includes the lots under final tract map 28532-4) until after March 5, 2021, because the City extended the development agreement to that date, and the agreement bars such fees.

E. *Trial and Judgment*

The Riverside County Superior Court held trial on November 9, 2018 and issued a written ruling on February 4, 2019.

The trial court denied the petition on the ground the development agreement controlled and allowed the City to require TUMF payments on lots within the map. "Development Agreement SPM-5 was entered into under Government Code sections 65864, et seq., the Development Agreement Law. Section D.2.b., of the Development Agreement provides that the City may impose new fees for development impact, provided the fees: apply Citywide; are not enacted to discriminatorily apply to the subject development; and, mitigate impacts that were not fully mitigated by the fees in existence at the time the Development Agreement was approved by the City (March 6, 2001). Petitioner does not argue or provide evidence contradicting the plain reading of the

10

Development Agreement. It is undisputed that the TUMF was effective Citywide and that it was not discriminately applied to developer D.R. Horton. Section 2 of the City's TUMF ordinance, City of Murrieta Ordinance No. 277-03, provides that the development impact fees prior to the ordinance were insufficient and that future development required increased fees for all developments."

In the most basic terms, the trial court concluded the City agreed to extend the vesting rights of the tentative map, but North Murrieta agreed the City could impose additional, generally applicable mitigation fees if the mitigation fees already in place were inadequate. The City determined it did need to impose additional mitigation fees and did so in conformity with the terms of the agreement. Accordingly, the trial court entered judgment in favor of the City and WRCOG and against North Murrieta on all three causes of action.

North Murrieta filed a timely notice of appeal. In its opening brief, they waived their right to recover the $244 in administrative fees the City retained from their payments. Though they appealed the entire judgment, they seek recovery of only the fees ultimately collected by WRCOG. Perhaps for this reason, though the City remains a party to the appeal, they have not filed a brief, leaving it to WRCOG to defend the collection of mitigation fees from D.R. Horton under the TUMF ordinance.

11

## II

## ANALYSIS

North Murrieta argues the trial court erred by concluding the development agreement governed the rights of the parties. They argue the vesting tentative map statutes provide a way of fixing a developer's rights that operates beyond the reach of any development agreement.[2]

It's well established that when "a local agency approves a vesting tentative map (§ 66498.1, subd. (b) ) or enters into a development agreement (§§ 65865, 65866), the builder is entitled to proceed on the project under the local rules, regulations, and ordinances in effect at the time of the approval." (*1901 First Street Owner, LLC v. Tustin Unified School Dist.* (2018) 21 Cal.App.5th 1186, 1195.) In this case, of course, the City approved a vesting tentative map (in 1999) *and* entered a development agreement (in 2001) affecting the same property.[3] The question we must resolve is whether a subsequent development agreement can alter the builder's vested rights under the vesting tentative map. This is a legal question which we review independently. (*Center for*

---

[2] Because North Murrieta argues the vesting tentative map statute and the City's act approving the vesting tentative map are the source of their rights, the parties spend large sections of their briefs contesting whether the vesting tentative map expired at various points over the 20 years since its approval. We conclude those arguments are irrelevant because the development agreement validly changed North Murrieta's rights and the City validly imposed the new mitigation fees under the agreement's terms.

[3] Though, as we've noted, the development agreement covered the entire Golden City Project, while the vesting tentative map at issue in this appeal covered only a portion of the larger development.

*Community Action & Environmental Justice v. City of Moreno Valley* (2018) 26

Cal.App.5th 689, 698 (*Center for Community Action*).)

We start by noting vesting tentative maps and development agreements share a

purpose. The Legislature enacted the vesting tentative map provisions "to freeze in place

those 'ordinances, policies and standards in effect' at the time the vesting tentative map

application is deemed complete . . . [and] 'offer[] developers a degree of assurance, not

previously available, against changes in regulations.'" (*Bright Development v. City of*

*Tracy* (1993) 20 Cal.App.4th 783, 793.) Similarly, it is "a purpose of the [development

agreement] statutory scheme that the public planning process will be strengthened and

private participation in comprehensive planning and cost reduction will be encouraged

where the applicant for a development project may receive assurances through such an

agreement that, upon approval of the project, the applicant may proceed in accordance

with existing policies, rules and regulations." (*National Parks & Conservation Assn. v.*

*County of Riverside* (1996) 42 Cal.App.4th 1505, 1521.)

Thus, obtaining either a vesting tentative map or entering a development

agreement allows a builder to rely on the regulations, conditions, and fees that exist at the

planning stage when assessing the economics of completing a development that may take

years or even decades to complete. "The purpose of [a] vesting tentative map and [a]

development agreement is to allow a developer who needs additional discretionary

approvals to complete a long-term development project as approved, regardless of any

intervening changes in local regulations." (*City of West Hollywood v. Beverly Towers,*

13

*Inc.* (1991) 52 Cal.3d 1184, 1194; see also §§ 65864 [development agreements], 66498.9 [vesting tentative maps].)

North Murrieta argues the City was required to give force to the limits on fees (and other conditions) conveyed by the approval of the vesting tentative map until that map formally expired. They argue that would extend the map's limitations, for the lots at issue in this appeal, until March 26, 2019, the date to which the City extended the vesting rights after approving the final map for tract 28532-4. We think their position misstates the situation. A vesting tentative map doesn't freeze regulations and fees indefinitely. The tentative map statute, which applies to vesting tentative maps, provides all tentative maps expire 24 months after their initial approval, though that period may be extended by ordinance up to 12 months. (§ 66452.6, subd. (a).) Here, the City approved North Murrieta's vesting tentative map on July 28, 1999. That means the map—and North Murrieta's rights—were set to expire on July 28, 2001. (§ 66452.6, subd. (a).)

As it happens, the City and North Murrieta came to an agreement to extend the term of the vesting tentative map by nearly 15 years. They accomplished this by entering the development agreement. The Legislature specifically allowed "a tentative map on property subject to a development agreement . . . may be extended for the period of time provided for in the agreement, but not beyond the duration of the agreement." (66452.6, subd. (a).) So, in March 2001, when North Murrieta was four months away from losing all the rights the vesting tentative map had conferred, they negotiated an extension of those rights with the City as part of the development agreement concerning the entire

14

Golden City Project. Without the development agreement, North Murrieta would have lost the vesting rights; with the development agreement, they retained at least some of those rights for an additional 15 years—20 years counting the later extension of the agreement.

However, the terms of the development agreement make clear the City did not agree to extend *all* the rights conveyed by the vesting tentative map. North Murrieta made concessions. For one, the parties agreed the date on which the City would be barred from imposing new fees and conditions was March 5, 2001, the effective date of the agreement, not the date the vesting tentative map was approved. "The development impact fees, user fees, linkage fees, assessments, charges, general or special taxes, municipal financing, land dedication requirements, fees and charges . . . which may be imposed by the City . . . are limited to those Exactions . . . currently adopted by the City as of the Effective Date."

Critically, North Murrieta also agreed to allow the City to impose new mitigation fees under certain conditions. Under the headings "Public Improvements" and "Permit Conditions and Exactions," the agreement provides the City would limit various types of fees as discussed above and would "impose only the Permitted Exactions as set forth and described herein."[CT 415} However, the agreement also says "the City *shall have the right* to: [¶] . . . [¶] . . . impose fees, increase permit fees and or exactions provided that they are effective Citywide (not specifically enacted to apply or be discriminately adverse to [development agreement] SPM-5) *for project impacts which are not fully mitigated by*

15

*existing fees or exactions at the time of the City's approval of this Development Agreement*." (Italics added.) The plain meaning of this provision was that the City could charge North Murrieta new, generally applicable mitigation fees like those imposed by the TUMF ordinance, so long as existing mitigation fees don't already suffice.

This provision was evidently an important concession by North Murrieta. In adopting the development agreement as an ordinance, the City Council found the development agreement "is in the best interest of the City because it provides for the construction of infrastructure needed to serve development in the area." The City Council included a short list of features of the agreement that made it notably beneficial, a list which included the fact that the development agreement "allows the City to impose future mitigation fees on the project if said fees are applied throughout the City." (Murrieta Ord. No. 230-01.)

In short, by entering the development agreement, North Murrieta agreed the City could impose fees already in place by March 6, 2001, and also agreed the City could impose other generally applicable fees the City determined were needed, beyond existing fees, to mitigate effects of development. The agreement is binding on both the City and the developer. (§ 65865.4 ["a development agreement shall be enforceable by any party thereto notwithstanding any change in any applicable general or specific plan, zoning, subdivision, or building regulation adopted by the city, county, or city and county entering the agreement, which alters or amends the rules, regulations, or policies specified in Section 65866"].) And the City must approve development agreements as

16

ordinances and record the agreements to give notice to the public, especially prospective purchasers such as D.R. Horton. (§ 65868.5 ["[T]he clerk of the legislative body shall record with the county recorder a copy of the agreement, which shall describe the land subject thereto. From and after the time of such recordation, the agreement shall impart such notice thereof to all persons as is afforded by the recording laws of this state"].) The same provision directs that "the burdens of the agreement shall be binding upon, and the benefits of the agreement shall inure to, all successors in interest to the parties to the agreement." (*Ibid*.)

North Murrieta offers no authority—and really no reason—for thinking vesting tentative maps impart a species of super rights that cannot be negotiated away. Nor do they offer any reason for thinking development agreements should be treated differently than other contractual agreements. The law says development agreements are contracts, enforceable like normal contracts. "A development agreement 'is an enforceable contract between the municipality and the developer.' [Citation.] 'In essence, the statute allows a city or county to freeze zoning and other land use regulation applicable to specified property to guarantee that a developer will not be affected by changes in the standards for government approval during the period of development.' [Citations.] It also permits 'municipalities to extract promises from the developers concerning financing and

construction of necessary infrastructure.'"[4] (*Center for Community Action*, *supra*, 26 Cal.App.5th at pp. 696-697.)

North Murrieta argues the vesting tentative map provides a separate source for their rights, unaffected by the development agreement. But this position can't withstand scrutiny of the terms of agreement. As our discussion reveals, altering the protections of the vesting tentative map was an explicit and critical part of the agreement. Some provisions benefited the developer. They obtained the City's agreement to limit for a period of 15 years their ability to impose new regulations, conditions, and fees not provided for by the agreement. But some provisions benefited the City. Most importantly, the provision giving it discretion to increase mitigation fees so long as they were generally applicable and aimed at mitigation not already provided for. North Murrieta can't claim the benefit of the provisions that benefit them but disclaim the provisions that don't. (See *Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes* (2010) 191 Cal.App.4th 435, 443-444 ["a legislatively approved development agreement gives both parties vested contractual rights"].)

The City took advantage of the provision allowing it to impose additional mitigation fees when it adopted the TUMF ordinance. The City Council found the new fees were needed to avoid traffic congestion and ensure the availability of safety services and determined the new fees were needed because "existing and known future funding

---

[4] The sole exception is that, as a legislative act, a development agreement is subject to referendum, but that wrinkle isn't at issue in this case. (*Center for Community Action*, *supra*, 26 Cal.App.5th at p. 697.)

18

sources will be inadequate to provide the necessary improvements to the Regional System." The ordinance specifies the new mitigation fees were imposed "to mitigate growing traffic impacts on the Regional System within Western Riverside County by collecting fees from residential and non-residential developments" and will be used to "construct the transportation improvements that are necessary for the safety, health and welfare of the residential and non-residential users of the development projects on which the TUMF will be levied." The new fees apply generally to "all new development projects within the City." Though the ordinance, as initially passed in 2003, exempted "[p]rojects with vesting tentative tract or parcel maps" the City Council removed that exemption in 2010, which made it applicable to the Golden City Project.

We conclude the development agreement gave the City the authority to impose new, generally applicable mitigation fees. Since North Murrieta doesn't contest the fees were generally applicable or imposed to mitigate effects of development not already covered by fees existing as of March 6, 2001, they have provided no basis for concluding the City overstepped its bounds by enacting the TUMF ordinance or charging and collecting the fees from D.R. Horton.

North Murrieta's complaint that the City's imposition of additional mitigation fees has frustrated its own and D.R. Horton's reliance expectations is not well taken. North Murrieta negotiated this agreement, which included the provision allowing the City to impose new mitigation fees. The City recorded the development agreement to give notice to prospective buyers. And D.R. Horton purchased the property with notice of the

19

development agreement as well as the fact that the City had in fact imposed additional mitigation fees. Developers are sophisticated entities, capable of and expected to conduct due diligence to determine their rights and duties. If either North Murrieta or D.R. Horton didn't factor these fees into their planning, the fault lies with them.

## III

## DISPOSITION

We affirm the judgment. The Western Riverside Council of Governments is entitled to their costs on appeal.

CERTIFIED FOR PUBLICATION


SLOUGH
Acting P. J.

We concur:


FIELDS
J.


RAPHAEL
J.